JESSE S. KAPLAN   CSB# 103726
5441 Fair Oaks Bl. Ste. C-1
Carmichael, CA   95608
(916) 488-3030
(916) 489-9297 fax

Attorney for Plaintiff
WILLIAM FINNEGAN

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM FINNEGAN,<br><br>　　　　Plaintiff,<br><br>v.<br><br>LINCOLN LIFE ASSURANCE COMPANY OF BOSTON, LINCOLN FINANCIAL GROUP, STANFORD HEALTH CARE LONG TERM DISABILITY BENEFITS PLAN,<br><br>　　　　Defendants._____/ | No. _____<br><br>COMPLAINT REGARDING DENIAL OF DISABILITY BENEFITS UNDER AN EMPLOYEE WELFARE BENEFITS PLAN |

Plaintiff WILLIAM FINNEGAN alleges:

## JURISDICTION AND VENUE

1. Jurisdiction of this court is conferred by the Employee Retirement Income Security Act of 1974 (*ERISA*), and in particular 29 U.S.C. §§1132(e)(1) and 1132(f). Those provisions give district courts jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan, which in this case consists of a group disability plan provided by the Stanford Health Care organization., to certain employees including plaintiff. In addition, this action may be brought before this court pursuant to 28 U.S.C. §1331, which

1

gives district courts jurisdiction over actions that arise under the laws of the United States.

2. The *ERISA* statutes provide, at 29 U.S.C. §1133, a mechanism for administrative or internal appeal of benefit denials. Plaintiff exhausted those remedies in the manner set forth below, entitling him to bring this complaint.

3. Venue is proper in the Northern District of California because plaintiff at all relevant times during that administrative process resided in Martinez, County of Contra Costa, in that District. (20 U.S.C. §1132(e)(2), 28 U..C. §1391)

## NATURE OF THE ACTION

4. This claim seeks an award to plaintiff of disability income benefits pursuant to an employee welfare benefit plan providing disability benefits to employees of Stanford Health Care, of which plaintiff was one. This action seeking recovery of benefits is brought pursuant to 29 U.S.C. §1132(a)(1)(B).

## PARTIES

5. Plaintiff WILLIAM FINNEGAN, an individual, at all relevant times resided in Martinez, County of Contra Costa, in the Northern District, as stated.

6. Defendant STANFORD HEALTH CARE LONG-TERM DISABILITY BENEFITS PLAN is named as constituting the relevant "employee welfare benefit plan" as defined by 29 U.S.C. §1001(1). Should this designation prove inaccurate, plaintiff may ask to amend this complaint to properly name the relevant plan.  Incident to his employment with Stanford Health Care, plaintiff received coverage under this plan as a "participant," as defined by 29 U.S.C. §1002(7). This claim relates to benefits under that plan.

7. Defendant LINCOLN LIFE ASSURANCE COMPANY OF BOSTON apparently performed the administrative reviews of this claim, and may or may not prove to be the plan administrator of defendant plan and/or a plan fiduciary; LINCOLN FINANCIAL GROUP is one name associated with the Lincoln National Corporation, which plaintiff believes owns and operates the named defendants.  All relevant actions set forth below were performed in the

1  name of LINCOLN LIFE ASSURANCE COMPANY OF BOSTON and LINCOLN FINANCIAL
2  GROUP, and the funds for the benefits claimed by plaintiff would come from these LINCOLN
3  entities.

**STATEMENT OF FACTS**

5      8. Plaintiff William "Bill" Finnegan, born January 19,1967, received a bachelor of science
6  degree in business management following an associate's degree in engineering. He possesses
7  various computer-related certifications for technical support; worked in technical support for
8  PeopleSoft, John Muir Health, and finally for Stanford Healthcare, which he had to leave
9  because he became disabled. During this career, he developed various hardware and software
10 skills as his technical support positions focused into the medical field, including in certain
11 medical software, and in particular had entry-level certification in medical imaging software,
12 the Picture Archive and Communication System (PACS).

13     9. Bill Finnegan underwent lumbar surgery twice in 2012, the second an L3–4 fusion,
14 and in 2013 had arthroscopic knee surgery. He became a pain management patient receiving
15 epidural steroid injections, but these failed to provide relief for his lumbar pain.

16     10. He filed a claim with defendants for long term disability benefits stating he became
17 unable to work for Stanford Health Care as of March 3, 2018. This date coincides with his
18 having determined in consultation with his doctor to pursue lumbar revision/fusion surgery and
19 also with the onset of acute neck and right arm pain and weakness. An MRI later that month
20 showed a C5–6 bulge resulting in bilateral neural foraminal stenosis and a C6–7 protrusion. In
21 May 2018 he underwent revision fusion surgery from L3 to L5. In addition, medical records
22 from this era indicate Mr. Finnegan weighed 300 pounds and had a body mass index of 45,
23 which is level III, or morbid, obesity.

24     11. Defendants granted Mr. Finnegan LTD benefits during this period. Dr. Kevin Booth,
25 who performed this two-level lumbar fusion, had indicated Bill Finnegan could return to work
26 on a part-time, four-hour per day basis with a lifting limit of 20 pounds as of September 13,

2018, but Mr. Finnegan's cervical problems — which had improved after their March 2018 onset sufficiently for the May 2019 surgery — worsened, with further radicular symptoms and discussion of cervical epidural steroid injection, and this return to work did not really happen.

12. Defendants, smelling blood, obtained an "independent" physician file review in October 2018, resulting in mixed messages. This doctor said on October 14, 2018, that the "return to work plan given by Dr. Booth was reasonable and appropriate at that time," but also that "The long term prognosis is guarded. The claimant is morbidly obese with a body mass index of 45. He has had two or three lumbar spine surgeries. He also has cervical disk disease and has discussed cervical epidural injections. He may gradually improve in coming months and should be able to resume full time work at some point," but then only 12 days later opined, "After 10/13/18 the records do not support inability to work full time with frequent sitting, standing or walking and occasional lifting up to 20 pounds."

13. Based on Mr. Finnegan's LTD policy's 26-week elimination period, this meant he qualified for disability benefits beginning September 1, 2018, and based on an October 29, 2018, letter from defendant LINCOLN giving no other reason beyond these inconsistent opinions of this doctor, he became disentitled to benefits after October 13, 2018. This letter also, vaguely, told him that his "Occupation falls under the description of Cashier," which, it said, "ranges from a Sedentary to Light physical demand level." Although the letter was not explicit upon the point, the implication was that Mr. Finnegan could therefore perform this, supposedly his own, occupation and so no longer met the policy's applicable unable-to-perform-his-occupation disability definition.

14. Mr. Finnegan retained counsel, who simultaneously provisionally appealed this denial and requested a copy of defendants' claim file in a letter dated April18, 2019, stating, that "assimilation of his position as a clinical associate system analyst I to the *D.O.T.* occupational title of cashier is inapppropriate; moreover, I believe there is more than one such title, so it fails to fulfill the *ERISA* statutory and regulatory requirements of advising of the basis for denial.

Also, I see no basis whatsoever for the capacity relied on for denial other than a nonexaminer's unexplained assertion, which conflicts with opinions of the treating doctor; and there is certainly no explanation of how Liberty resolved that conflict or even a clear statement that unexplained opinion was adopted."

15. Defendants' records should reflect that they did not send counsel the claim file until June 2019 and then counsel was not able to open it or reach a representative of defendant who could assist with this.

16. On July 6, 2019, Mr. Finnegan's counsel wrote a longer letter to defendant LINCOLN. This letter requested further time because of the claim-file delays. It also pointed out that though LINCOLN's denial stated Mr. Finnegan's occupation was "cashier" and "sedentary to light," its "own in-house 9/19/18 vocational analysis of Megan Provost, MA, says his occupation is systems analyst, sedentary to light, and involving *constant handling and fingering.*" It also pointed out all the statements of nonexaminer Dr. C. David Bomar — endorsing treating surgeon Dr. Kevin Booth's return-to-work plan, calling Mr. Finnegan's long term prognosis "guarded," noting his morbid obesity, multiple lumbar surgeries, cervical disc disease with discussion of epidural steroid injections, and that Mr. Finnegan "*may* improve" and "be able to resume full time work *at some point,*" and even that "Updated records should be reviewed in two or three months," and that Mr. Finnegan had seen a pain specialist, Dr. James Rhee, on 9/13/18 with findings of decreased sensation in both thumbs and discussion of cervical epidural injections — but that then 12 days later, in a short memo responding to LINCOLN's request, "Please confirm if William Finnegan has a SED capacity," nonexamining Dr. Bomar effectively contradicted what he said only 12 days earlier. Counsel's letter pointed out that LINCOLN's records showed it had learned, between those two dates of the Dr. Bomar opinions that Mr. Finnegan had not made it through even his third day in September of the return-to-work plan. Moreover, LINCOLN's records revealed that the treating surgeon Dr. Booth had reviewed a yet *earlier* September 25, 2018, memo from nonexamining Dr. Bomar in which Dr.

Bomar stated he didn't know enough to opine because he'd only seen records of Mr. Finnegan's primary care physician Dr. Alphaeus Wise — and treating surgeon Dr. Booth had written, in response to that *earliest* nonexamining memo, on September 28, 2018, "William Finnegan has not returned to work — unable to work!!" As counsel wrote, nothing in LINCOLN's file indicated LINCOLN advised its nonexaminer, Dr. Bomar, of treating surgeon Dr. Booth's emphatic information that Mr. Finnegan had not been able to return to work and was unable to work. Counsel's letter noted that even though LINCOLN knew Mr. Finnegan wasn't working it had terminated his benefits. Counsel's letter pointed out that LINCOLN's file showed it had records reflecting serious, measured right-arm and grip weakness in March 2018, when the claim began, correlating with a herniated C6–7 disc and other problems demonstrated by an MRI done then, and that even though records referred to sufficient improvement in these conditions to proceed with Mr. Finnegan's two-level lumbar revision fusion surgery, this information was inconsistent with LINCOLN's own vocational information that Mr. Finnegan's occupation of systems analyst, per its own in-house vocational expert, critically required *constant* handling and fingering.

17. By way of an August 7, 2019, letter of counsel, LINCOLN received an August 1, 2019, functional capacity form opinion from Mr. Finnegan's treating primary care physician Dr. Alphaeus Wise, which specifically enunciated the particulars of a significantly less-than-sedentary capacity based on the lumbar condition, including inability to work a full day, and specifically stated no improvement was expected without (further) surgical intervention.

18. By way of a December 19, 2019, letter, Mr. Finnegan's counsel's office conveyed to defendants hospital records from November 2019. These showed Mr. Finnegan suffered from "severe lumbar spinal stenosis secondary to transition syndrome L1–2, L2–3," that is that he was experiencing pain from yet further intervertebral interspaces beyond his previous twice-performed two-level fusion. They also showed that on November 13, 2019, Mr. Finnegan underwent, among other details, "Posterior lumbar fusion, T12–L1, L1–L2, L2–L3, L3–L4," again

by Dr. Kevin Booth.

19. Exactly one month before this *four*-level fusion, LINCOLN subjected Mr. Finnegan to an "independent" medical exam by a Dr. George Blankinship. This Dr. Blankinship's October 14, 2019, report reflects Dr. Blankinship did see treating primary care physician Dr. Wise's clearly disabling functional capacity opinion but otherwise saw no medical records more recent than from a year earlier, and that LINCOLN did share with him its in-house vocational report. This Dr. Blankinship's report opined Mr. Finnegan had *more* than a sedentary capacity, miraculously he had a light lifting/carrying capacity and halfway between a sedentary and a light standing/walking capacity, consistent with the vocational report. Ironically, Dr.lanikinship's report even pointed out that, "The anatomy of a spinal fusion lends itself to pressure on adjacent levels above and below the fusion. With inadequate medical restrictions decreasing the pressure on the lumbar spine, the claimant is at an increased risk of developing symptomatic adjacent segment disease." This of course had already happened to the point of surgery being scheduled when Dr. Blankenship opined the capacity that fit the in-house vocational report like a glove.

20. Notably, an October 11, 2019, letter of Mr. Finnegan's counsel to the company that employed this Dr. Blankinship, a copy of which went to LINCOLN, stated for the record that an attempt had been made to reschedule this IME, that Mr. Finnegan was sick, had been out of town and unaware of the scheduling of this IME, and that because of these things Mr. Finnegan had been unable to obtain recent medical records but, "If Lincoln Financial did not provide their medical information, the onus is on them. I, myself, can only provide or obtain such information by mail. <u>Mr. Finnegan is scheduled for lumbar fusion surgery next month</u>; probably recent medical information *does* exist, therefore."

21. Thus, both LINCOLN and the company providing Dr. Blankinship's services to LINCOLN knew three days before Dr. Blankinship's IME that Mr. Finnegan was scheduled for (his *fourth*) lumbar surgery (and third such fusion surgery) the month after this IME, but there

is no indication in Dr. Blankinship's report of this surgery.

22. LINCOLN's files should reflect repeated inquiries from Mr. Finnegan's counsel, and that LINCOLN did not send a copy of its December 2, 2019, letter upholding its termination of Mr. Finnegan's claim to counsel until April 16, 2020. That letter contains the sentence, "You mentioned Mr. Finnegan is scheduled for lumbar fusion this month and on November 18, 2019, we requested a call back regarding Mr. Finnegan's surgery however to date, we have not received a response."

23. However, on November 25, 2019, Mr. Finnegan's counsel's office faxed LINCOLN a letter advising that, "On November 13, 2019[,] Mr. Finnegan had a multilevel spine fusion with revision that was performed at the location below[,] and I've sent a request for records," and provided the name, address, and phone number of the hospital and surgeon Dr. Booth. A copy of this letter is attached as an exhibit and thus made a part of this record. As pleaded in paragraph 19, the hospital and operative records were provided to defendants December 19, 2019, and as pleaded in paragraph 22, defendants failed to provide Mr. Finnegan's counsel with a copy of its denial letter until April 16, 2020, despite requests. Defendants' denial letter insists both that it did not receive information about Mr. Finnegan's surgery and that this information was irrelevant to its determination that nondisability commenced October 13, 2018, despite the self-contradictions regarding this from nonexamining Dr. Bomar and the vocational and other problems described in paragraphs, 12, 13, 14, and 16, and despite the contradictory opinions of treating doctors Booth and Wise, and despite its apparent reliance on Dr. Blankinship's IME from the month before the surgery, performed after defendants were specifically advised of this impending surgery, the mere fact of which contradicted the opinions in that IME report.

24. Plaintiff's administrative remedies have thus been exhausted.

25. As a direct, legal and proximate consequence of defendants' acts, omissions, and breaches of the plan, policy, and *ERISA,* WILLIAM FINNEGAN has exhausted his administrative remedies and is entitled to pursue this complaint to secure the disability benefits

defendants denied him.

## CLAIMS

26. The determination by defendants that plaintiff was not disabled and entitled to long term disability benefits under the plan was contrary to the plan, *ERISA,* and the evidence, lacks rational and legal support, and was arbitrary and capricious.

27. Defendants failed properly to interpret and administer the plan pursuant to 29 U.S.C. §1104.

28. Defendants failed to provide adequate notice specifying their reasons for denial in a manner calculated to be understood by plaintiff such that he could perfect an appeal, failed to provide critical information to doctors it relied on in denying its claim.

29. Defendants failed properly to consider all the evidence.

30. Defendants acted under a conflict of interest in denying the claim, and such conflicts of interest were contrary to plan terms and *ERISA*, which impose fiduciary duties on plan administrators and require any delegation of such authority as would be relevant here be done according to specified procedures.

31. Defendants did not give fair, impartial weight to plaintiff's evidence and subjective symptoms, and relied instead on in-house and retained examining and nonexamining consultants, on illogical and improper methodology, and on inaccurate interpretations of plan terms and nonexistent requirements. Defendants rendered a vocationally and factually inaccurate disability determination, failing properly to consider vocational and medical information in their own file and then failing and refusing to correct clear error when afforded the opportunity to do so.

32. All of the foregoing constituted breach of defendants' fiduciary duties under §1104 and other authority.

33. Plaintiff's claim was therefore unlawfully denied, and he is entitled to an order granting him benefits and otherwise enforcing the plan under 29 U.S.C. §1132(a)(1)(B) and

other authority.

**WHEREFORE,** plaintiff prays for the following relief:

A. That the court enter judgment in plaintiff's favor and against defendants, and that the court order defendants to pay disability benefits, and award all other consequent rights and privileges consistent with the Plan to plaintiff, including all back benefits, and all rights appurtenant to having been awarded disability status at the proper time;

B. That the court order declaratory and injunctive relief whereby plaintiff's disability claim is reopened, granted, and his attorney fees are paid;

C. That the court order attorney fees paid to plaintiff pursuant to 29 U.S.C. §1132(g);

D. That the court impose prejudgment interest to the maximum extent allowed by law on all monetary awards and orders made in plaintiff's favor, and further order post-judgment interest from the date of such awards and orders;

E. That the court grant plaintiff any other and further relief to which he may be entitled, including costs of suit.

DATED: October 18, 2020          /s/   Jesse S. Kaplan

                                 JESSE S. KAPLAN
                                 Attorney for Plaintiff
                                 WILLIAM FINNEGAN